U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET



**The following constitutes the ruling of the court and has the force and effect therein described.**

_____
**United States Bankruptcy Judge**

**Signed November 21, 2012**

---

## THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ONDOVA LIMITED COMPANY, | § | Case No. 09-34784-SGJ-11, |
| | § | |
| Debtor. | § | |

### FINDINGS OF FACT AND CONCLUSIONS OF LAW IN SUPPORT OF ORDER CONFIRMING THIRD AMENDED JOINT PLAN OF LIQUIDATION FOR DEBTOR'S ESTATE UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE [DE #924, FILED NOVEMBER 12, 2012][1]

### I.    Introduction

The above-referenced bankruptcy judge held an evidentiary

hearing on November 13, 14, 16 and 19 ("Confirmation Hearing") to

consider confirmation of a Third Amended Joint Plan of

---

[1] "DE # _ " as used herein refers to the Docket Entry number at which a pleading is filed in the docket maintained by the Bankruptcy Clerk in the bankruptcy case of _In re Ondova Limited Company_, Case No. 09-34784-SGJ-11 .

Liquidation for Debtor's Estate Under Chapter 11 of the United States Bankruptcy Code (the "Joint Plan") [DE # 924].  The Joint Plan was proposed jointly by:  (a) Daniel J. Sherman, the Chapter 11 Trustee ("Chapter 11 Trustee") over the bankruptcy estate of Ondova Limited Company ("Ondova" or the "Debtor"), and (b) Peter S. Vogel, the Receiver ("Receiver") presiding over the equity receivership ("Receivership") established by the United States District Court for the Northern District of Texas, Dallas Division ("District Court"), in Case No. 3:09-CV-0988-F ("District Court Case"), on November 24, 2011, with respect to Mr. Jeffrey Baron ("Baron") and Baron's affiliated entities other than Ondova (collectively, the "Receivership Entities").  Baron was formerly the chief officer and sole equity owner of the Chapter 11 Debtor, Ondova.  The Joint Plan contemplates approval and implementation of:  (a) a so-called "Plan Settlement"[2] between the Ondova bankruptcy estate and the Receivership Entities; (b) a sale of significant assets contributed to the Joint Plan by the Receivership; (c) the creation of a Liquidating Trust to accept substantially all the assets and liabilities of both the Ondova bankruptcy estate and the Receivership, which Liquidating Trust would resolve and pay all remaining claims of and against the Receivership and the Debtor, with a return of

---

[2] All capitalized terms used herein that are not expressly defined herein shall have the meaning ascribed to them in the Joint Plan.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**                              Page 2

residual funds or assets to Baron after the satisfaction of all claims; and (d) certain releases of parties and professionals. The bankruptcy court heard testimony from six (6) witnesses and reviewed extensive documentary evidence during the 4-day Confirmation Hearing. The court, on occasion, took judicial notice of case filings or case events, when requested by a party. Based upon the evidence submitted, the court hereby approves and confirms the Joint Plan, pursuant to Section 1129 of the Bankruptcy Code and, as part and parcel, approves the overall fairness and equity of the Plan Settlement, pursuant to Bankruptcy Rule 9019 (including the ancillary releases of parties and professionals that has been proposed) and the overall fairness of the sale process and proposed sale of assets further described herein, pursuant to Section 363 and 105 of the Bankruptcy Code. The court overrules all pending objections to the Joint Plan. Finally, this court will also make a report and recommendation to the District Court, proposing that the District Court, after considering these Findings and Conclusions, approve the Joint Plan as it relates to the Receivership. The following are the bankruptcy court's findings of fact and conclusions of law from the Confirmation Hearing, pursuant to Fed. R. Bankr P. 7052 and Fed. R. Civ. P. 52. The court reserves the right to supplement or amend these Findings of Fact and Conclusions of Law. Any Finding of Fact set forth herein that is more in the nature of a Conclusion of Law should be deemed as such,

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

notwithstanding subheadings herein, and *vice versa*.

## II. Jurisdiction

The Confirmation Hearing was a contested matter.  Fed. R. Bankr P. 9014.  Bankruptcy subject matter jurisdiction existed in the contested matter pursuant to 28 U.S.C. § 1334(b).  This bankruptcy court had authority to exercise the bankruptcy subject matter jurisdiction in the contested matter, pursuant to 28 U.S.C. § 157(a) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984, and pursuant to various specific orders of the District Court entered in the related District Court Case.  Additionally, statutory "core" matters have been involved in this contested matter, as contemplated by at least 28 U.S.C. § 157(b)(2)(A), (B), (L), (N) and (O).

## III. Findings of Fact

1.  By way of background, Ondova filed a voluntarily Chapter 11 bankruptcy case in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, on July 27, 2009 (Case No. 09-34784-SGJ-11) at a time when Ondova was still controlled by Ondova's former president and sole equity owner, Mr. Baron.  As alluded to earlier, Mr. Baron and related non-Ondova entities that Mr. Baron once controlled are currently the subject of a federal equity receivership.

2.  Ondova was formerly in the business of being an internet

domain name registrar ("Registrar"). As is fairly well known, an "internet domain name" is a term that most typically ends in the characters ".com" or ".net" and is essentially an internet address. Testifying experts in this case referred to domain names as something similar to "virtual real estate."

3.   Ondova was formerly engaged in the business of being something like a "middle man" in the domain name world in that, for a fee, Ondova could register a ".com" or ".net" domain name for a person wanting to own and use a domain name (the latter being referred to as a "Registrant"). Ondova performed this "middle man" registration activity pursuant to a license it had from the Internet Corporation for Assigned Names and Numbers ("ICANN")—which is, essentially, a creature of the United States Department of Commerce–and also pursuant to an agreement with Verisign, Inc. ("Verisign")–which is a private corporation that essentially acts as the operator of the huge ".com" and ".net" registries. Verisign is not in any way related to Ondova.

4.   Approximately six weeks after Mr. Baron filed the Ondova bankruptcy case, this bankruptcy judge ordered the appointment of a Chapter 11 Trustee, on September 11, 2009 [DE # 85], when certain creditors and the bankruptcy court became concerned that Mr. Baron did not understand basic fiduciary duties and did not want to cooperate in many regards. Among other things, Mr. Baron hired and fired lawyers repeatedly and did not wish to testify on certain relevant subjects (asserting his Fifth Amendment

privilege against self-incrimination, rather than testifying about the business affairs of Ondova).  The United States Trustee, thus, appointed the individual named Daniel J. Sherman as the Ondova Chapter 11 Trustee on September 17, 2009 [DE # 98]. No party ever appealed the order directing the appointment of a chapter 11 trustee.

5.  Over the course of the Ondova bankruptcy case, it was reported by parties that there were hundreds of thousands of ".com" and ".net" domain names (perhaps 600,000 or more in number) that had been owned by various offshore companies/trusts that Mr. Baron owned or controlled, or by a joint venture that Mr. Baron was a part of, and a few domain names were even owned by Ondova.[3]  Certain of these domain names were subject to claims of trademark-infringement (and posed litigation risks and burdens); certain of these domain names were possibly valuable; and certain of these domain names were likely not-so-valuable. There was various litigation in both the bankruptcy court and before the District Court (Judge Royal Furgeson), regarding these domain names.

6.  Certain litigation before Judge Royal Furgeson regarding

---

[3] The term "ownership" *vis-a-vis* an internet domain name is somewhat imprecise.  A member of the public can register a domain name for use on the internet, and thereby become known as the "registrant" for the domain name.  This right to usage of a name is more similar to a lease right, as opposed to ownership of the name. Obviously, there are often individuals or companies who register a trademark for certain names and these people are more in the nature of "owners."

certain domain names was originally styled *NetSphere Inc., Manila Industries, Inc. and Munish Krishan v. Jeffrey Baron and Ondova Limited Company,* Civil Action No. 3:09-CV-0988-F (earlier defined as the "District Court Case").  Eventually, a Mutual Settlement and Release Agreement ("2010 Global Settlement")[4] was reached and approved by the bankruptcy court on July 28, 2010 [DE # 394] that appeared to resolve much of the Ondova bankruptcy case, the Judge Furgeson District Court Case, and many other pending lawsuits and disputes in various courts.  There were dozens of parties to this 2010 Global Settlement, including Mr. Baron and various offshore entities that Mr. Baron controlled directly or indirectly. However, Mr. Baron promptly began hiring and firing more lawyers and undertaking litigation tactics that seemed aimed at undermining the 2010 Global Settlement, driving up costs, and delaying the Ondova bankruptcy case.  Eventually, District Judge Furgeson appointed a receiver over Mr. Baron's assets and personal affairs, in an Order Appointing Receiver, signed by him on November 24, 2010, as clarified by a second order on December 17, 2010 (collectively, the "Receivership Orders").  The Receivership Orders did the following, among other things:  (a) put the assets and business affairs of Mr. Baron (other than Ondova–which was, of course, already in a bankruptcy case under the control of a Chapter 11 Trustee) into a personal

---

[4] Exh. N-1.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**                    **Page 7**

receivership, with Peter S. Vogel as the Receiver—mostly so that the 2010 Global Settlement could be at long-last finalized; (b) clarified that various entities that Mr. Baron controlled, including an entity named Novo Point and an entity named Quantec, were parties included as part of the receivership (the "Receivership Parties").  The entities Novo Point and Quantec owned (or were Registrants for) most of the domain names controlled by Mr. Baron.

7.   The bankruptcy case and Receivership District Court case have been lengthy and wildly contentious, largely because Mr. Baron has opposed through attorneys virtually every action proposed by either the Chapter 11 Trustee or the Receiver (many times the Chapter 11 Trustee and Receiver have proposed joint actions-seeking approval in both the District Court and bankruptcy court) and, when either the Chapter 11 Trustee or Receiver have obtained court permission to take an action, Mr. Baron has usually appealed the applicable court order.  This court has been informed that there are several dozen appeals now pending at the United States Court of Appeals for the Fifth Circuit ("Fifth Circuit").

8.   Against this back drop, the Chapter 11 Trustee and Receiver have now proposed the Joint Plan to attempt to finally put an end to the Ondova bankruptcy case and the Receivership. It was reported to the bankruptcy court prior to the confirmation Hearing that the Receivership currently has approximately $1.5

million of cash on hand and the Ondova bankruptcy estate currently has approximately $900,000 of cash on hand. There are well in excess of $3 million of unpaid administrative expenses and claims that are pending against the Ondova estate and against Mr. Baron or Mr. Baron's entities (and some claimants have asserted claims against both Ondova and Mr. Baron jointly and severally or interchangeably). Many of the claims are former lawyers' fee claims, but there have also been other creditors of various types asserting claims against Ondova and Mr. Baron—not the least of which was the University of Texas, which was asserting trademark infringement claims against Ondova (asserting approximately $4 million of damages, which the Chapter 11 Trustee negotiated down to $250,000). There were various other claimants asserting trademark infringement claims.

9. The lines between Mr. Baron, Ondova, and the Receivership Parties have sometimes been blurry. The Chapter 11 Trustee and Receiver have presented credible arguments and evidence of alter ego *vis-a-vis* Mr. Baron and the various entities he controlled. Moreover, certain claimants (lawyers) who were engaged by Mr. Baron individually to represent Mr. Baron's interests have made "substantial contribution" claims against the Ondova bankruptcy estate, pursuant to Section 503(b)(3)(D) and (4) of the Bankruptcy Code. Moreover, Ondova has incurred various legal fees and expenses associated with the

Receivership (including fees and expenses incurred at the Fifth Circuit) that the Chapter 11 Trustee asserts should be reimbursed by the Receivership. In light of these facts, and to avoid the expense, delay and complexity of further litigation, the Receiver and Chapter 11 Trustee reached the Plan Settlement (as further defined in the Joint Plan). The Plan Settlement contemplates, among other things: (a) a settlement of all claims by and between the Chapter 11 Trustee, on the one hand, and the Receivership Entities, on the other hand, conditioned on confirmation and consummation of the Joint Plan; (b) establishment of a Liquidating Trust (with the Chapter 11 Trustee to serve as Liquidating Trustee); (c) acceptance by the Liquidating Trust of essentially all the liability asserted against the Receivership, the Receivership Entities, the Ondova estate and Ondova (with the exception of Manilla/NetSphere's alleged damages now being asserted against Mr. Baron for Mr. Baron's alleged breach of the post-Ondova-bankruptcy 2010 Global Settlement); (d) transfer to the Liquidating Trust of the domain name portfolios that are held by the Receivership Entities known as Novo Point and Quantec, and/or the sale proceeds of such domain names, with such domain names to be liquidated in an auction and sale process pursuant to Section 363 of the Bankruptcy Code; (e) transfer to the Liquidating Trust of all remaining assets of the Ondova bankruptcy estate and the Receivership, except for certain amounts of Receivership cash on

hand necessary to pay unpaid Receivership counsel fees and other costs (with the establishment of a wind-down plan for the Receivership in conjunction with the Liquidating Trust); and (f) residual assets of the Liquidating Trustee to be returned to Mr. Baron ultimately.  Any and all professional fee and expense claims not already approved will be required to be approved by either the District Court or the bankruptcy court (as appropriate).

10.  To be clear, a pooling of assets and liabilities is contemplated between the Ondova bankruptcy estate and Receivership (see Section 1123(a)(5)(C) of the Bankruptcy Code), and the justification that has been proposed for same is not just alter ego facts and arguments, but the fact that the Ondova estate has cogent arguments that it has incurred fees and expenses that should be reimbursed by the Receiver and there are many claimants who could cogently argue claims against both Ondova and the Baron entities. The court finds that the Plan Settlement between the Ondova estate and the Receivership is fair and equitable and is in the best interests of the two estates, the various creditors of both, and also to Baron. In making this finding, the court is considering a multitude of factors, including the complexity and likely duration of further litigation in both the bankruptcy court and District Court if there is no settlement, and any attendant expense; the inconvenience and delay associated with such litigation; the

proportion of creditors who do not object to, or who affirmatively support the proposed settlement; the extent to which the settlement is truly the product of arms' length bargaining and not the product of fraud or collusion (in fact, the court specifically finds that the Chapter 11 Trustee and Receiver have bargained at arms' length and in good faith regarding the Plan Settlement); and this court has considered, generally, all factors bearing on the wisdom of the compromise. The court has given deference to the reasonable views of creditors here.  And the court has consulted case law such as *Protective Committee for Independent Stockholders of TMT Trailer Ferry v. Anderson*, 88 S. Ct. 1157 (1968); *United States v. AWECO, Inc. (In re AWECO),* Inc.0, 725 F.2d 293 (5th Cir. 1984), *cert denied*, 105 S. Ct. 244 (1984); and *Connecticut Gen. Life Ins. Co. v. United Companies Fin. Corp. (In re Foster Mortgage Co.)*, 68 F.3d 914 (5th Cir. 1995).

11.  As mentioned earlier, as part and parcel of the Joint Plan Confirmation Hearing, is a joint request of the Chapter 11 Trustee and the Receiver that this court approve a sale of certain internet domain name assets "as is, where is," and free and clear of all interests, pursuant to Section 363(f) and 105 of the Bankruptcy Code, and pursuant to the equitable jurisdiction that has been referred to this court by District Judge Furgeson. The internet domain name assets (which will hereinafter simply be

referred to as the "Domain Names") that are proposed to be sold have been held in recent years by the Receivership Parties known as Novo Point and Quantec. The Receiver and Chapter 11 Trustee have proposed that the Domain Names be permitted to be sold for $5.2 million (cash) to an entity named Trans Ltd., which was the winning bidder in an auction presided over by the Receiver on November 9, 2012 ("Winning Bidder"). If for any reason, this sale cannot close, the Receiver and Chapter 11 Trustee have proposed that the Domain Names be permitted to be sold for $5.1 million (cash) to an entity named Special Jewel Ltd., which was the second-highest bidder at the auction on November 9, 2012 ("Back-Up Bidder"). By way of background, in late September and early October 2012, both the District Court and the bankruptcy court approved certain sale procedures to be undertaken by the Receiver and Chapter 11 Trustee to attempt to market and sell the Domain Names. Motions to start the sale process were filed on September 14, 2012 and ultimately vetted and approved in hearings in the District Court and bankruptcy court on September 27, 2012 and September 28, 2012, respectively. The marketing and auction procedures approved contemplated use by the Receiver and Chapter 11 Trustee of a $4.1 million stalking horse bid that had been received by what-is-now the Back-Up Bidder and exposing that bid to the market place and soliciting higher or better bids. The stalking horse bid was accompanied by a $500,000 cash deposit (which was placed with the Receiver's law firm in an escrow) and

competing bidders were required to put up a $500,000 deposit as well. A minimum overbid was required of $4.3 million, and subsequent overbids would be required to be in $100,000 increments. The Receiver and Chapter 11 Trustee asked for and were granted permission to engage in certain advertising and other marketing efforts to attempt to find interested bidders for the Domain Names. The marketing procedures proposed and approved have been referred to as too-fast by Baron, but timing-wise and procedure-wise, they were typical of what is frequently approved in complex Chapter 11 bankruptcy cases. Among other things, interested bidders were required to sign confidentiality agreements before they could receive data regarding the Domain Names.

12. For the record, the court will define more specifically the Domain Names. The Domain Names are approximately 153,000 ".com" and ".net" internet domain names (approximately 3,300 of which are held in Novo Point and the remainder of which are held in Quantec). The Domain Names have been submitted to the bankruptcy court for review[5] and were somewhat described in various witness testimony. The Domain Names can be described and categorized as follows: (a) a relatively small percentage of the 153,000 Domain Names are what the court would refer to as generic names (e.g., "eyedoctors.com"

_____

[5] Exh. 42.

or "dinnerware.com") that do not appear to be obviously
trademark-infringing in any way (hereinafter, the "Generic
Names");[6] (b) an extremely large percentage of the Domain Names
are what the court would refer to as intentionally misspelled
names (hereinafter, the "Typosquatting Names")—in other words,
names that any reasonable person would consider strikingly
similar to some commercial entity that likely owns a trademark in
connection with its business (such as a banking institution or
movie company), but certain letters have been transposed or added
to the Domain Name such that the Domain Name is not exactly the
same as the commercial business's name (e.g., "wellsfagro.com");
(c) another portion of the Domain Names are names of schools,
cities, municipalities that may not be trademarked
("Institutional Names"); (d) another portion of the names are in
the nature of gaming ("Gaming Names"); and (e) a very large
percentage of the Domain Names are clearly, under the "know-it-
when-you-see-it" definition of former Justice Potter Stewart,[7]
pornography-oriented ("Pornography Names").  Within the category
of Pornography Names, is a very disturbing subset of Domain Names
that no reasonable person could deny are descriptive of child

---

[6] It appears that the roughly 3,300 names in the Novo Point
portfolio are largely Generic Names but in the much larger Quantec
portfolio the Generic Names seem to be a small percentage of the
names.

[7] *Jacobellis v. Ohio,* 378 U.S. 184, 197 (1964) (concurring
opinion of J. Stewart).

pornography (*e.g.,* "childsexporn.com," pedophilesex.com,"
"naked13yearolds.com"–with there being many, many names that are
far more course than these three examples ("Child Pornography
Names").  There are also a small percentage of very disturbing
racial/hate crime oriented names ("Race/Hate Names").  As part of
the sale process, the Winning Bidder and Back-Up Bidder have
agreed to carve out from the sale the Child Pornography Names and
Race/Hate Names, and the Chapter 11 Trustee and Receiver have
agreed not only to deactivate these Domain Names but report them
to appropriate law enforcement officials for such officials to
presumably take appropriate action as they may deem fit.

13.  This court describes herein the categories or types of
Domain Names for a variety of reason.  First, the question of
value of these names has been hotly disputed at the Confirmation
Hearing.  Mr. Baron has objected vehemently to the sale of the
Domain Names.  He believes they are worth $60+ million, which is
far less than the $5.2 million Winning Bid for the Domain Names.
But the credible evidence from the Confirmation Hearing (from the
Receiver; the Chapter 11 Trustee; Mr. Baron; Matthew Morris (the
Receiver's expert); Thies Lindenthal (Mr. Baron's expert); and
Steve Lieberman, a lawyer representative for the Winning Bidder,
by telephone) ***just does not support such a conclusion***.  As
pointed out, a great many of the Domain Names are Typo-Squatting
Names (subject to challenge as trademark infringing and likely to

be culled out, as further described below) or are Pornography
Names (many of which will be culled out because of their Child
Pornography nature). The Generic Names are the names that mostly
have potential interest and value and some history of earning
revenue.  The court also points out the nature of the Domain
Names for another reason.  Mr. Baron has represented himself as
being a "grandfather" of the internet and a business entrepreneur
being deprived of his livelihood.  Mr. Baron has spent enormous
time in the court system, purportedly to protect his business
interests.  The Confirmation Hearing was the first time this
bankruptcy court (and perhaps any court) has been given a full
flavor for the nature of the Domain Names.  As set forth above, a
great majority of the names are centered around what is commonly
referred to as typo-squatting or cyber-squatting and,
essentially, involves leasing a name that is arguably subject to
another person's trademark. And, while this court does not pass
judgment on the societal value of the Pornography Names,
certainly, it does not pass the "smell-test" (or good faith
notions) to ask this court or any other court to value or protect
Mr. Baron's right to Child Pornography Names such as
"naked13yearolds.com."[8]

    14.  In any event, on further analyzing the proposed sale
for $5.2 million of the Domain Names, the court further reviews

---

    [8] Ex. 42 (page 395 of 945).

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**                       **Page 17**

the evidence concerning the steps leading up to this now-proposed sale. The credible evidence was that both District Judge Ferguson and this bankruptcy judge, as well as the United States Trustee, had expressed the view by Spring-Summer 2012 at various hearings that the Receivership and Chapter 11 case had gone on too long and needed to be brought to a conclusion. Since there is less cash on hand than there are administrative claims and creditor claims, it appeared that monetization of certain of the non-liquid assets of Ondova's estate or the Receivership (i.e., the Domain Names) would be necessary in order to resolve all creditor claims and conclude the Receivership and Chapter 11 case. There seemed to be no other viable option other than a sale of the Domain Names. At one time, Mr. Baron's lawyer had suggested the possibility to the Receiver of perhaps trying to obtain a new lender loan, collateralized by the Domain Names, and using the new loan to pay off the Receivership and bankruptcy estate debt and then end the Receivership/bankruptcy case that way. Only one lender was recommended by Mr. Baron's lawyer and such lender proposed an approximately $1 million loan at a 32% interest rate and the lender seemed to lack credibility (the Receiver actually credibly testified that he feared the lender was proposing something criminal in nature). The Receiver contacted various banks himself, but they did not have much interest and did not consider the Domain Names to be acceptable collateral. Thus, the Receiver began investigating the

possibility of selling the Domain Names in a bundle.  In the past, certain persons have randomly contacted Receiver with an interest in buying certain names.  Certain Domain Names were sold earlier during the Receivership on a one-off basis or in small groups.  Also, the Receiver frequently is contacted by persons who believe certain Domain Names are trademark-infringing and these people have asked the Receiver to release such Domain Names.  In any event, the Receiver credibly testified that he believes that there have become fewer and fewer Domain Names in the Novo Point and Quantec portfolios that seem to have value on a standalone basis.  At this time, the Receiver does not believe there are any remaining Domain Names that "light up the market place," to use the Receiver's words.

15.  An individual named Damon Nelson, a former Ondova employee whom District Judge Furgeson allowed the Receiver to appoint as a temporary manager of the Domain Names portfolios, had begun investigating values and marketing possibilities for the Domain Names back in early 2011.  Damon Nelson marketed or at least submitted the Domain Names portfolios to 24 of the top brokers in the domain name industry.  The Receiver believed in 2011, based on those investigations, that the Domain Names as a whole might have a value of $3.5 million.  The Receiver received in September 2012 an unsolicited offer of $3.5 million from the entity known as Special Jewel Ltd. and the Receiver eventually negotiated this offer up to $4.1 million and obtained the

agreement of this bidder to be a stalking horse bidder, whose bid would be subject to higher or better offers. In October 2012, both District Judge Furgeson and the bankruptcy judge authorized a bid process for the Domain Names. The Receiver subsequently bought so-called banner advertisements notifying the marketplace that the Domain Names were for sale. A website was built that promoted the sale. The portfolios were identified and historical revenue information for the Domain Names was made available. Advertisements were placed in the Wall Street Journal (United States, China, and European versions). Persons were allowed to participate in an auction on November 9, 2012 if they provided evidence of financial wherewithal to fund their purchase price (*e.g.,* bank letter), if they put up a $500,000 deposit, and if they signed a letter of intent and form of Asset Purchase Agreement.

16. The Receiver initially received bids from three parties, but one of the parties backed out before the November 9, 2012 auction. Eventually, a bidder named Trans Ltd. submitted the highest bid at the November 9, 2012 auction in the amount of $5.2 million ("Winning Bidder") and Special Jewel remained in as a possible "backup bidder" at $5.1 million (Back-Up Bidder").

17. The Receiver credibly testified that Domain Names are not cost-free to hold indefinitely—which is one reason why selling them sooner rather than later seemed to be prudent to

him.  For example, the costs associated with these Domain Names
include an annual cost to register the names of $7.58 per name
for "dot com" names and slightly less for "dot net" names.  The
Receiver also credibly testified that there has been about
another $30,000 per month of overhead associated with keeping up
the Domain Names through services of Damon Nelson and certain
lawyers. Among other things, these individuals have assisted with
the analysis (early on) of determining what non-performing Domain
Names could or should be deleted.  The Receivership Entities
formerly registered a larger number of Domain Names than the
current 153,000.

18.  The credible testimony from multiple witnesses was that
there are three main ways to yield value from internet domain
names:  (a) "the parking method" (which is the main way Baron
utilized the names)—this refers to simply creating a website
using a name and placing advertisements or other links at the
website and earning revenue from the advertisements placed on the
website or click revenue when users click on links; (b) "building
out" a website utilizing a domain name–which is more
sophisticated than the parking method, in that you come up with
ways to draw people to the website through search engine
optimization and other techniques; or (c) selling a name.

19.  Mr. Baron testified that one can also enter into
partnerships to lease domain names to parties who want to use
them.  Mr. Baron has ended up in litigation the few times he has

attempted that in the past.

20.  Mr. Baron has never sold a domain name himself.  But he has numerous criticisms of the Receiver's marketing/sale procedures in this case.  Mr. Baron believes that Domain Names should be sold in small groups (not in a huge bundle of 153,000 names like is proposed by the Receiver).  Mr. Baron believes the Receiver should have advertised longer than was done here, and marketed to people that are reputable.  Mr. Baron said he would remove names that are not good ones.  Mr. Baron said that the $500,000 deposit requirement chilled bidding.

21.  The Receiver's expert (Matthew Morris) credibly testified that he believed the Domain Names were worth from $3-5 million.  He used a methodology for valuing the names that was a hybrid between an income (or discounted cash flow approach) and a market value approach. A large number of the Domain Names in the portfolio do not generate income.  Mr. Morris admitted that there is a dilemma in valuing domain names whether to use a traditional income approach (deriving value through utilizing some appropriate multiple of income) or, alternatively, whether some sort of intrinsic or inherent value is more appropriate.  The problem with using some sort of intrinsic value is that many domain names have value because of an organization that spent millions of dollars building a concept (*i.e.,* google.com or amazon.com) as opposed to the name itself having some inherent

cache.  It is much like gazing into a crystal ball, trying to predict whether a particular name might someday have some sort of appeal.  Matthew Morris credibly testified that between 27-30% of domain names are typically not renewed by a registrant. The court found Mr. Morris to be credible. Mr. Morris believes that past income is the most reliable of all factors that might point to value.

22.  Mr. Morris also credibly testified that he thought an auction process is a preferred method for maximizing value with domain names at this point in time.  Domain names are inherently unique.  For unique assets (for example art work would be unique; gold would not be unique), an auction is a preferred method of sale because it allows for price discovery; there could be a wide range of value that different, widespread people ascribe to the assets.

23.  Mr. Morris also credibly testified that the fact that these Domain Names have been held by an individual who has been involved in so much litigation is a negative factor.  The evidence has shown that Mr. Baron is a litigious individual. This fact can deter interested bidders—although a Section 363 bankruptcy sale increases confidence that a buyer will get assets free and clear of the past litigation.

24.  Mr. Morris also credibly testified that selling these assets in a big bundle is superior ("diversification is good") because it spreads out overhead associated with these names.

25.  Mr. Morris also credibly testified about the so-called "UDRP" process or mechanism, pursuant to which domain names with trademark infringement allegations can be arbitrated; in other words, claimants can assert claims against domain name holders who hold names that allegedly infringe on a claimant's trademark. 82% of such claimants end up obtaining the allegedly infringing domain name.  Mr. Morris testified that the more UDRP problems a portfolio of domain names has, the more it diminishes the value of the names.  If one markets a portfolio with a lot of "typo squatting" names in the public, it highlights it to trademark owners and can cause problems.  Novo Point and Quantec have a lot of "typo squatting" names; thus, the more one might carve up the Novo Point and Quantec portfolios and prolong the sale process, the more this might become a negative factor.  Additionally, on the topic of typo-squatting names, there is more search engine sophistication now that diminishes the value of typo-squatting names.  In the past, if one misspelled a domain name, one likely ended up at the site of the misspelled name (assuming there was such a site).  Now, search engines typically have a typo-adjusting mechanism asking the typist if he meant to spell the more commonly recognized term (*e.g.,* "did you mean wells fargo?").

26.  Mr. Morris also credibly testified that it is more advantageous to sell the Domain Names now versus later.  There

are changes on the horizon in this industry. Specifically, there are new TDL names (*i.e.,* Top Level Domain names) launching in coming months, so that there will not be just ".com" and ".net" domain names that are prevalent in the future. There will be "dot" followed by other letters. This will create a greatly expanded universe of domain names and a "noisier" internet. This has the potential to diminish the value of ".com" and ".net" domain names. Also, the advent of "apps" (that is, applications used by iPhones and iPads) has some negative impact on internet searching. ***Mr. Morris credibly testified that the income stream is likely downward slopping for the Domain Names.*** Time value of money is also a factor.

27. Mr. Morris credibly testified that he looked at the list of Domain Names; statistics with some of them; income characteristics of the names from the reports from monetizers (an entity known as Domain Holdings has been the most recent monetizer for the Domain Names).

28. Mr. Morris also credibly testified that Mr. Baron is a factor with regard to the marketability of these names. The Receiver credibly testified that people are afraid of being sued by him, given a reputation he has developed for being a vexatious litigator.

29. Mr. Baron testified that either names owned by Ondova or the Receivership Parties (unclear which) at one time earned

$1.5 million per month through monetization efforts. There is no evidence of this other than Mr. Baron's word. Mr. Morris testified that his research showed the portfolio of Domain Names had never earned anywhere close to this amount of revenue. The court cannot and does not find it to be true, by a preponderance of the evidence.

30. As mentioned earlier, Mr. Baron referred to himself in testimony as a "grandfather of the domain name industry." The court finds this to be somewhat of an exaggeration of Mr. Baron's business model or stature in the internet industry.

31. Mr. Baron's expert, Dr. Lindenthal, was less experienced overall than Mr. Morris (age wise and in the overall field of valuation), but happened to have approximately one year's experience working as a product manager for Sedo, LLC—which is a large, well known broker of internet domain names. Dr. Lindenthal described himself as having worked in the internet industry for more than a decade and has a fair amount of experience studying price trends in the secondary market of domain names. Dr. Lindenthal obtained his PhD in Real Estate Finance just over one year ago. After a *Daubert*-objection[9] was lodged by the Receiver's counsel, the court did not let Dr. Lindenthal testify as to his opinion on the value of the Domain

---

[9] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

Names, because he could not share the methodology he used–it is proprietary information of Sedo, LLC.  *See* Fed .R. Ev. 702 (court must have the ability to ascertain whether an expert witness's testimony is the product of reliable principles and methods and that the witness has applied the principles and methods reliably to the facts of the case).  However, the court did allow Dr. Lindenthal to testify that he thought there were about 3,300 Domain Names that potentially had value (and further testified that Sedo, LLC will typically not be involved with selling domain names that have UDRP problems, child porn, hate crimes—and this was a large portion of the Quantec/Novo Point portfolio).  Dr. Lindenthal testified that there were different factors to consider in evaluating a domain name:  how often is it looked for; is it in the finance, insurance or science industries (these tend to be the most valuable); how long is the name (shorter is better); names with hyphens or numbers are less attractive; certain languages (English) and Arabic characters tend to be more valuable.  Once looking at these factors, one might look at similar comparables and for what price those similar comparable names might have sold.  ***Dr. Lindenthal thought that it could take a very long time to manually appraise the whole portfolio of Domain Names here (and it could cost several hundreds of thousands of dollars), but it looked like there were some "great names."***  Dr. Lindenthal did not think new TDLs and iPhone apps

were as negative for domain names going forward as Mr. Morris.

32.   Dr. Lindenthal further testified that a broker such as his company, Sedo, LLC, typically charges about a 15% commission on domain name sales.  The court notes that Sedo, LLC was hired approximately one year ago to attempt to sell one domain name owned by Ondova that all parties thought had substantial value (servers.com), but Sedo, LLC has not obtained a bid yet that parties consider favorable.

33.   On balance, the court finds that Mr. Morris provided the most credible overall testimony regarding the Domain Names (although Dr. Lindenthal provided some helpful testimony as well) and, based on the credible evidence, this court finds and concludes that the marketing, auction and sale process were fair and reasonable and the product of reasonable business judgment, an arms length, good faith and fair process, there was a business justification therefore, and the result was a fair price and winning bid and back up bid that are reasonably equivalent to the best evidence of market value of the Domain Names.

34.   The court also finds that the Winning Bidder and Back-up Bidder (if the latter is ultimately the purchaser), were good faith purchasers for value.  This finding is based on the overall evidence from the Receiver and Chapter 11 Trustee regarding the sale process.  But it is also based on the limited testimony that the court heard from the representative of the Winning Bidder. The Winning Bidder originally did not want to reveal the identity

of the human beings behind Trans Ltd.  Ultimately, the human beings' identity was revealed (first in camera to the bankruptcy judge and United States  Trustee, and then in open court on the record–with Mr. Baron's counsel being allowed to ask specific questions regarding the human beings).  The representative for Trans Ltd. credibly testified that the human beings behind Trans Ltd. are afraid of being sued by Mr. Baron, based on Mr. Baron's reputation.  The court believes that—while these individuals may have privacy concerns that may or may not be rational— the individuals are not in any way "insiders" (11 U.S.C. § 101(31)) and have not colluded or engaged in any other improper means in connection with the Domain Names sale.  They should take the Domain Names assets with the protections contemplated by Section 363(f) of the Bankruptcy Code.

35.   The court makes one last point with regard to the Domain Names sale.  It has been argued that this court does not have authority to approve the sale of assets that are owned by the Receivership.  First, the court notes that the Plan Settlement (which this court has ruled is fair and equitable and in the best interest of all parties including Baron) essentially contemplates the transfer of the Receivership Assets to the Ondova Liquidating Trust, for reasons already described.  But even if the Plan Settlement were not alone grounds, the court notes that at least the following cases provide support for this court approving the sale of the Receivership Domain Names.  *In re*

*Indian Motocycle Co., Inc.*, 261 B.R. 800, 803 (B.A.P. 1st Cir. 2001) (wherein, after negotiation, a Chapter 7 trustee in certain Massachusetts bankruptcy cases and a Receiver entered an agreement for the joint sale of the assets of the bankruptcy estates and the receivership estate which would allocate sufficient funds from the sale to the bankruptcy estates to pay all claims, with the remainder going to the Receiver as owner of the equity; the agreement was approved by the bankruptcy court on January 19, 1996 and the district court on January 29, 1996; ultimately, in late 1998 and early 1999, both courts approved the joint sale of the assets; as part of the sale, the parties agreed that $3.5 million would be allocated to the Debtors and held in escrow in order to satisfy any claims against the Debtors' estates.); *In re Stone & Webster, Inc.*, 286 B.R. 532, 539 (Bankr. D. Del. 2002) (holding that consolidation of the estates of separate debtors may sometimes be appropriate, as when the affairs of an individual and a corporation owned or controlled by that individual are so intermingled that the court cannot separate their assets and liabilities).

### IV.  Conclusions of Law

36.  The Plan Settlement is fair, equitable and in the best interests of the bankruptcy estate, the Receivership and Mr. Baron.  Fed. R. Bankr. Pro. 9019.  *Protective Committee for Independent Stockholders of TMT Trailer Ferry v. Anderson*, 88 S.

Ct. 1157 (1968); *United States v. AWECO, Inc. (In re AWECO),*
Inc.0, 725 F.2d 293 (5th Cir. 1984), *cert denied*, 105 S. Ct. 244
(1984); and *Connecticut Gen. Life Ins. Co. v. United Companies*
*Fin. Corp. (In re Foster Mortgage Co.)*, 68 F.3d 914 (5th Cir.
1995).

37. The auction and sale process was fair, reasonable, there
was a sound business justification for same, and the Chapter 11
Trustee and Receiver exercised reasonable business judgment.  The
Domain Names are entitled to be sold free and clear of interests,
pursuant to Sections 105 and  363(f) of the Bankruptcy Code.

38. Finally, with regard to the Joint Plan overall and its
confirmability, the court finds and concludes that notice of the
Joint Plan has been in compliance with Bankruptcy Code Section
1125 and 1126 and Bankruptcy Rules 3017 and 3018 and other
applicable authority.  It appears from the record that all
creditors and other parties in interest have been given the
requisite notice and copies of the Joint Plan solicitation
materials and ballots.  It appears that solicitation was in
compliance with applicable law.  And the court finds and
concludes that the Joint Plan has been accepted by a requisite
number of holders of impaired claims and interests.  The court
accepts as credible evidence the Ballot Certification filed with
the court.  The court finds and concludes that all pending
objections to the Joint Plan should be overruled.

39.   The Joint Plan, as modified, meets the requirements of Section 1122, 1123 and 1129 of the Code.  Specifically, the classification of claims and interests in the Joint Plan is proper and consistent with Section 1122; the means for the Joint Plan's implementation appears to be proper and within the guidelines of Section 1123; the Joint Plan complies with the applicable provisions of Title 11; the plan proponents have complied with the applicable provisions of Title 11; the Joint Plan has been proposed in good faith and not by any means forbidden by law; any payment made or to be made by the proponents, or by the Debtor, or by a person issuing securities or acquiring property under the plan, for services or costs and expenses in connection with the case, or in connection with the Plan and incident to the case, has been approved by, or is subject to the approval of, the court as reasonable; the proponents of the Joint Plan have disclosed the identity and affiliations of any individual proposed to serve after confirmation as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor that is a joint plan proponent with the Debtor, or a successor to the Debtor; the Joint Plan meets the so called "best interests" test of Section 1129(a)(7) of the Bankruptcy Code; the Joint Plan is feasible; with respect to each class in the plan, all classes have either accepted the plan or such class is not impaired under the Plan, or, with respect to any nonaccepting class, the Joint Plan may be cram

downed on the members of the class, in that the Joint Plan is fair and equitable does not discriminate as contemplated by Section 1129(b) of the Bankruptcy Code.

40.  The court also finds and concludes that all transfers of property under the Joint Plan are made in accordance with any applicable provisions of nonbankrutpcy law that govern the transfer of property.

41.  With regard to plan modifications that have been announced in court, the court specifically finds that they meet the requirements of Section 1122, 1123 and 1129 and so the plan, as modified, will be the plan that the court now confirms. Acceptances of the plan will be deemed to apply to the plan as modified without further notice, solicitation or hearing being required, since any described proposed plan modifications do not adversely change the treatment of the claim of any creditor or the interest of an equity security holder who has not accepted in writing the modification.

42.  The court specifically finds and concludes that the Joint Plan provides intrinsic benefits in that it ends pre-bankruptcy and pre-Receivership litigation except for claims that Manilla/NetSphere intends to pursue against Mr. Baron for Mr. Baron's alleged breach of the 2010 Global Settlement.  With this one exception, Mr. Baron will be litigation-free and is estimated to receive residual cash of a few million dollars. All claims other than NetSphere/Manilla's alleged breach-of-the 2010-Global

Settlement claims can be paid pursuant to the terms of this Joint Plan. As mentioned earlier, this bankruptcy case and Receivership have been about more than simply claims of former lawyers and claims of Manilla/NetSphere. The University of Texas asserted a $4 million claim against the Ondova bankruptcy estate relating to trademark infringement which the Chapter 11 Trustee eventually settled at $250,000 (which has not been paid yet) and the Chapter 11 Trustee also settled large claims asserted against Ondova by such entities as Grupo Andrea and Liberty Media. In addition to ending litigation, this court finds and concludes that the Joint Plan effectuates a responsible wind-down of a questionable business model that was partly centered around cyber-squatting.

43. Finally, the court will specifically address the so-called releases, exculpations, and injunctions in the Joint Plan. The court determines that these are not the type of impermissible plan releases or exculpation described by the Fifth Circuit in *Bank of N.Y Trust Co. v. Off. Unsec. Creds. Comm. (In re Pacific Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009). First, the court finds many of them to be more in the nature of compromises and settlements that may occur in a plan pursuant to Section 1123(b)(3)(A)—which says that a plan may "provide for the settlement or adjustment of any claim or interest belong to the debtor or the estate." Moreover, other of the releases seem

supportable under such cases as *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746 (5th Cir. 1995) given that this is a case with extremely unusual circumstances and broad and complex compromises.  But even if such releases are not supportable under that authority, this court determines that the releases and injunctions should be construed as temporary, and only approved on a temporary basis, for so long as the Joint Plan is being performed.  *See In re Seatco*, 257 B.R. 469 (Bankr. N.D. Tex. 2001).

44.  This court reserves the right to supplement and amend these Findings of Fact and Conclusions of Law.  Any objection to the Joint Plan or plan process that is not otherwise herein addressed is overruled and denied.  All pending motions relating to confirmation, including motions to continue, to reopen discovery, or recuse the judge, are hereby denied as having no merit.  A separate order shall be entered forthwith confirming the Joint Plan.  A separate Report and Recommendation will be presented to District Judge Furgeson.


### ###END OF FINDINGS OF FACT AND CONCLUSIONS OF LAW###